No. 24-1791

# In the
# United States Court of Appeals
## for the Fourth Circuit

GEORGE HAWKINS,

*Plaintiff-Appellant,*

v.

GLENN YOUNGKIN, in his official capacity as Governor of Virginia, and
KELLY GEE, in her official capacity as Secretary of the Commonwealth,

*Defendants-Appellees.*

Appeal from the United States District Court
for the Eastern District of Virginia, Richmond Division, No. 3:23-cv-00232-JAG
The Honorable John A. Gibney, Jr., Judge Presiding

## OPENING BRIEF OF APPELLANT GEORGE HAWKINS

Victor M. Glasberg
VICTOR M. GLASBERG & ASSOCIATES
121 S. Columbus Street
Alexandria, VA 22314
Tel: 703-684-1100
vmg@robinhoodesq.com

Jon Sherman
Michelle Kanter Cohen
Nina G. Beck
Emily P. Davis
FAIR ELECTIONS CENTER
1825 K St. NW, Ste. 701
Washington, DC 20006
Tel: 202-331-0114
jsherman@fairelectionscenter.org
mkantercohen@fairelectionscenter.org
nbeck@fairelectionscenter.org
edavis@fairelectionscenter.org

*Counsel for Plaintiff-Appellant*

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. _24-1791_        Caption: _Hawkins v. Youngkin, et al._

Pursuant to FRAP 26.1 and Local Rule 26.1,

_George Hawkins_
(name of party/amicus)

_____

who is _____Appellant_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)


1.     Is party/amicus a publicly held corporation or other publicly held entity?    ☐YES ☑NO


2.     Does party/amicus have any parent corporations?                          ☐YES ☑NO
       If yes, identify all parent corporations, including all generations of parent corporations:




3.     Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?                                              ☐YES ☑NO
       If yes, identify all such owners:

4.      Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?      ☐YES ☑NO
If yes, identify entity and nature of interest:

5.      Is party a trade association? (amici curiae do not complete this question)      ☐YES ☑NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.      Does this case arise out of a bankruptcy proceeding?      ☐YES ☑NO
If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7.      Is this a criminal case in which there was an organizational victim?      ☐YES ☑NO
If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ Jonathan Sherman      Date: August 28, 2024

Counsel for: Appellant George Hawkins

Print to PDF for Filing

## TABLE OF CONTENTS

DISCLOSURE STATEMENT ................................................................. ii

TABLE OF CONTENTS ...................................................................... iv

TABLE OF AUTHORITIES ................................................................. vii

INTRODUCTION .................................................................................. 1

JURISDICTIONAL STATEMENT ........................................................ 2

STATEMENT OF ISSUES ................................................................... 2

STATEMENT OF CASE ...................................................................... 3

    I.    Factual and legal background on felony disenfranchisement and re-enfranchisement in Virginia ................................................. 3

    II.    Procedural history ................................................................. 11

SUMMARY OF ARGUMENT .............................................................. 11

ARGUMENT ..................................................................................... 15

    I.    Standard of Review .............................................................. 15

    II.    Appellant has properly invoked the First Amendment unfettered discretion doctrine. ............................................ 15

        A.    The First Amendment protects voting as political expressive conduct. ................................................. 16

        B.    Plaintiff has properly invoked the First Amendment unfettered discretion doctrine. ..................................... 20

            1.    The Supreme Court and this Court have long prohibited vesting government officials with unfettered discretion over protected expression or expressive conduct. .......... 20

iv

2.     The same principles and concerns that have animated the First Amendment unfettered discretion doctrine are all implicated here.................................................................23

III.   The district court erred in ruling that the First Amendment unfettered discretion doctrine does not apply to Virginia's selective, arbitrary re-enfranchisement system. ...................................................28

A.     First Amendment cases must be analyzed functionally...........28

B.     Even if this Court finds the district court engaged in a functional analysis, it nonetheless erred in failing to consider the practical effects of Virginia's selective voting rights restoration system..........................................................................35

1.     There is no functional difference between granting (or re-granting) a "right" or a "license" to exercise specific, regulated forms of political expressive conduct............37

2.     The purported distinctions the district court cites are immaterial to the functional analysis.............................39

3.     Similarly, the district court's attempt to limit the unfettered discretion doctrine to time, place, and manner regulations must also fail. ...............................................43

4.     The district court's reasoning would make a federal constitutional doctrine subservient to arbitrary state-law terms and labels. ...........................................................44

5.     There is no functional difference between granting, terminating, and reactivating or re-granting permission to engage in expressive conduct. .......................................47

C.     The district court's reliance on the Sixth Circuit decision in *Lostutter* was misplaced...........................................................50

CONCLUSION .....................................................................................54

STATEMENT REGARDING ORAL ARGUMENT ............................................55

CERTIFICATE OF COMPLIANCE ......................................................................56

CERTIFICATE OF SERVICE ...............................................................................57

## TABLE OF AUTHORITIES

**Cases**

*Aleman v. Beshear*,
    144 S. Ct. 809 (2024)...................................................................28

*Am. Entertainers, L.L.C. v. City of Rocky Mount*,
    888 F.3d 707 (4th Cir. 2018) ......................................................22

*Anderson v. Celebrezze*,
    460 U.S. 780 (1983).......................................................17, 18, 19

*Bantam Books, Inc. v. Sullivan*,
    372 U.S. 58 (1963).......................................................................29

*Belk v. Charlotte-Mechlenburg Bd. of Educ.*,
    269 F.3d 305 (4th Cir. 2001) ......................................................15

*Bigelow v. Virginia*,
    421 U.S. 809 (1975).....................................................................29

*Bland v. Roberts*,
    730 F.3d 368 (4th Cir. 2013) ......................................................17

*Blount v. Clarke*,
    291 Va. 198 (2016) ......................................................................52

*Branti v. Finkel*,
    445 U.S. 507 (1980).....................................................................29

*Buckley v. Valeo*,
    424 U.S. 1 (1976).........................................................................30

*Burson v. Freeman*,
    504 U.S. 191 (1992).....................................................................17

*Chesapeake B & M, Inc. v. Harford Cnty.*,
    58 F.3d 1005 (4th Cir. 1995) ......................................................23

*Child Evangelism Fellowship of Md., Inc. v. Montgomery Cnty. Pub. Schs.*,
    457 F.3d 376 (4th Cir. 2006) ...................................................................22, 39

*Child Evangelism Fellowship of S.C. v. Anderson Sch. Dist. Five*,
    470 F.3d 1062 (4th Cir. 2006) ................................. 21, 22, 25, 26, 27, 30, 54

*Citizens United v. FEC*,
    558 U.S. 310 (2010)........................................................................17, 31, 32

*City of Ladue v. Gilleo*,
    512 U.S. 43 (1994)....................................................................................17

*City of Lakewood v. Plain Dealer Publ'g Co.*,
    486 U.S. 750 (1988)................................. 20, 21, 26, 27, 38, 41, 54

*City of Littleton v. Z.J. Gifts D-4, LLC*,
    541 U.S. 774 (2004)....................................................................................20

*Colorado Republican Federal Campaign Comm. v. FEC*,
    518 U.S. 604 (1996)...........................................................................17, 30

*Connecticut Bd. of Pardons v. Dumschat*,
    452 U.S. 458 (1981)....................................................................................24

*Epona v. County of Ventura*,
    876 F.3d 1214 (9th Cir. 2017) ....................................................................47

*FEC v. Colorado Republican Federal Campaign Comm.*,
    533 U.S. 431 (2001)...........................................................................30, 31

*FEC v. Wisconsin Right to Life, Inc.*,
    551 U.S. 449 (2007)....................................................................................31

*Forsyth County v. Nationalist Movement*,
    505 U.S. 123 (1992)...........................................................................20, 21, 22

*FW/PBS, Inc. v. City of Dallas*,
    493 U.S. 215 (1990)....................................................................................20

*Garcetti v. Ceballos*,
    547 U.S. 410 (2006)....................................................................................29

*Gasparo v. City of New York*,
    16 F. Supp. 2d 198 (E.D.N.Y. 1998) ..........................................................48

*Hand v. DeSantis*,
    946 F.3d 1272 (11th Cir. 2020) ...................................................................51

*Hand v. Scott*,
    888 F.3d 1206 (11th Cir. 2018) .............................................................50, 51

*Harris v. Quinn*,
    573 U.S. 616 (2014).....................................................................................46

*Harvey v. Brewer*,
    605 F.3d 1067 (9th Cir. 2010) .....................................................................49

*Heffron v. Int'l Soc'y for Krishna Consciousness, Inc.*,
    452 U.S. 640 (1981)...............................................................................27, 44

*Herrera v. Collins*,
    506 U.S. 390 (1993).....................................................................................23

*Howell v. McAuliffe*,
    292 Va. 320 (2016)......................................................................................51

*Ill. State Bd. of Elections v. Socialist Workers Party*,
    440 U.S. 173 (1979).....................................................................................18

*In re Brice*,
    188 F.3d 576 (4th Cir. 1999) .......................................................................15

*In re Phillips*,
    265 Va. 81 (2003) ....................................................................................4, 10

*Kaahumanu v. Hawaii*,
    682 F.3d 789 (9th Cir. 2012) .......................................................................48

*Lebron v. Nat'l R.R. Passenger Corp.*,
 513 U.S. 374 (1995).................................................................30

*Lostutter v. Kentucky*,
 No. 22-5703, 2023 WL 4636868 (6th Cir. July 20, 2023)..........28, 36, 50, 51

*Lovell v. City of Griffin*,
 303 U.S. 444 (1938).................................................................13

*McCutcheon v. FEC*,
 572 U.S. 185 (2014).................................................................17

*McIntyre v. Ohio Elections Comm'n*,
 514 U.S. 334 (1995).................................................................18

*Minnesota Voters All. v. Mansky*,
 585 U.S. 1 (2018)....................................................................27

*National Ass'n for Advancement of Colored People v. Button*,
 371 U.S. 415 (1963).................................................................46

*Norman v. Reed*,
 502 U.S. 279 (1992).............................................................13, 18

*O'Hare Truck Serv., Inc. v. City of Northlake*,
 518 U.S. 712 (1996).................................................................46

*Owens v. Barnes*,
 711 F.2d 25 (3d Cir. 1983) ......................................................48

*PBM Products, LLC v. Mead Johnson & Co.*,
 639 F.3d 111 (4th Cir. 2011) ...................................................15

*Press-Enter. Co. v. Superior Ct.*,
 478 U.S. 1 (1986)....................................................................29

*Quackenbush v. Allstate Insurance Co.*,
 517 U.S. 706 (1996).............................................................32, 33

*Randall v. Sorrell*,
 548 U.S. 230 (2006)......................................................................17

*Richardson v. Ramirez*,
 418 U.S. 24 (1974)........................................................................12

*Roach v. Stouffer*,
 560 F.3d 860 (8th Cir. 2009) ...........................................39, 41, 42

*Saia v. New York*,
 334 U.S. 558 (1948).................................................................53, 54

*Shepherd v. Trevino*,
 575 F.2d 1110 (5th Cir. 1978) ...................................................48, 49

*Shuttlesworth v. City of Birmingham*,
 394 U.S. 147 (1969)..................................................................24, 25

*Tennessee Wine & Spirits Retailers Ass'n v. Thomas*,
 588 U.S. 504 (2019)..................................................................17, 18

*Van Wagner Bos., LLC v. Davey*,
 770 F.3d 33 (1st Cir. 2014)........................................................39, 48

*Wesberry v. Sanders*,
 376 U.S. 1 (1964).........................................................................19

*West Lynn Creamery, Inc. v. Healy*,
 512 U.S. 186 (1994)......................................................................24

*Williams v. Rhodes*,
 393 U.S. 23 (1968).......................................................................19

*Williams v. Taylor*,
 677 F.2d 510 (5th Cir. 1982) .......................................................48

**Statutes**

28 U.S.C. § 1291 ...........................................................................2

28 U.S.C. § 1331 ....................................................................................2

28 U.S.C. § 1343 ....................................................................................2

42 U.S.C. § 1983 ....................................................................................1

ALASKA STAT. ANN. § 15.05.030 ...........................................................53

CAL. ELEC. CODE § 2101(a) ...................................................................52

COLO. REV. STAT. ANN. § 1-2-103(4) .....................................................52

CONN. GEN. STAT. ANN. § 9-46 ..............................................................52

CONN. GEN. STAT. ANN. § 9-46(a) ..........................................................52

D.C. MUN. REGS. tit. 3 § 500.2 ..............................................................53

HAW. REV. STAT. ANN. § 831-2(a)(1) ......................................................52

IDAHO CODE ANN. § 18-310(2) ...............................................................53

730 ILL. COMP. STAT. 5/5-5-5 ................................................................52

IND. CODE ANN. § 3-7-13-4 .....................................................................52

IND. CODE ANN. § 3-7-13-5 .....................................................................52

KAN. STAT. ANN. § 21-6613 ...................................................................53

KAN. STAT. ANN. § 22-3722 ...................................................................53

KY. REV. STAT. § 196.045(1)(e) ..............................................................51

LA. STAT. ANN. § 18:102(A)(1)(b) ..........................................................53

MASS. GEN. LAWS ANN. ch. 51, § 1 ........................................................52

MD. CODE ANN. ELEC. LAW § 3-102(b)(1) ...............................................52

MICH. COMP. LAWS ANN. § 168.758b ..................................................52

MINN. STAT. ANN. § 609.165 ...............................................................52

MO. ANN. STAT. § 115.133 ...................................................................53

MONT. CODE ANN. § 46-18-801(2) .......................................................52

N.C. GEN. STAT. ANN. § 13-1 ..............................................................53

N.C. GEN. STAT. ANN. § 13-2 ..............................................................53

N.D. CENT. CODE ANN. § 12.1-33-01 ...................................................52

N.D. CENT. CODE ANN. § 12.1-33-03 ...................................................52

N.H. REV. STAT. ANN. § 607-A:2 ........................................................52

N.H. REV. STAT. ANN. § 607-A:3 ........................................................52

N.J. STAT. ANN. § 2C:51-3 ..................................................................52

N.J. STAT. ANN. § 19:4-1(8) ................................................................52

N.M. STAT. ANN. § 31-13-1 .................................................................52

N.Y. ELEC. LAW § 5-106(3) ................................................................52

NEB. REV. STAT. ANN. § 29-112 .........................................................53

NEV. REV. STAT. ANN. § 213.157 ........................................................52

OKLA. STAT. ANN. tit. 26, § 4-101 ......................................................53

OHIO REV. CODE ANN. § 2961.01(A)...................................................52

OR. REV. STAT. ANN. § 137.281(7).......................................................52

25 PA. STAT. § 2602(t) .........................................................................52

25 PA. STAT. § 2602(w) ........................................................52

S.C. CODE ANN. § 7-5-120(B) ...........................................53

S.D. CODIFIED LAWS § 24-5-2 ...........................................53

TEX. ELEC. CODE ANN. § 11.002 ........................................53

UTAH CODE ANN. § 20A-2-101.5(2) ..................................53

VA. CODE ANN. § 24.2-101 .........................................3, 46, 51

VA. CODE ANN. § 24.2-427(D) ..............................................3

VA. CODE ANN. § 24.2-1016 ...........................................4, 36

VA. CODE ANN. § 53.1-231.1 .............................................4, 5

VT. STAT. ANN. tit. 28, § 807(a)........................................53

W. VA. CODE ANN. § 3-2-2 ..................................................53

WASH. REV. CODE ANN. § 29A.08.520(1) ........................53

WIS. STAT. ANN. § 304.078 ................................................53

## Constitutional Provisions

U.S. CONST. amend. I .................................................*passim*

U.S. CONST. amend. XIV ...................................................12

U.S. CONST. art. VI, cl. 2 ....................................................46

ARK. CONST. amend. 51, § 11(d) ......................................53

COLO. CONST. art. 7, § 10....................................................52

GA. CONST. art. II, § I, para. III........................................53

ILL. CONST. art. III, § 2..........................................................................52

MASS. CONST. amend. art. III................................................................52

ME. CONST. art. II, § 1..........................................................................53

MONT. CONST. art. IV, § 2 ....................................................................52

R.I. CONST. art. II, § 1 ..........................................................................53

VA. CONST. art. II, § 1 .....................................................3, 4, 44, 46, 51

VA. CONST. art. V, § 12..................................................................3, 4, 52

## Other Authorities

OFF. OF THE SEC'Y OF THE COMMONWEALTH, RESTORATION OF RIGHTS FORM,
    https://www.restore.virginia.gov/media/governorvirginiagov/restoration-of-
    rights/pdf/ror_form.pdf (last visited Oct. 24, 2024).......................................7

PA. DEP'T OF STATE, VOTING RIGHTS OF CONVICTED FELONS, CONVICTED
    MISDEMEANANTS          AND          PRETRIAL          DETAINEES,
    https://www.pa.gov/content/dam/copapwp-pagov/en/vote/your-rights-and-
    the-law/Convicted-felon-brochure-English.pdf.......................................52, 53

## INTRODUCTION

Virginia law gives the Governor sole and unfettered discretion to selectively re-enfranchise individuals who are currently ineligible to vote due to a felony conviction. Appellee Governor Glenn Youngkin bases these decisions on a "predictive judgment regarding whether an applicant will live as a responsible citizen." JA141. In the district court's words, the governor is empowered to act "[m]uch like a monarch." JA365.[1]

Plaintiff-Appellant George Hawkins ("Plaintiff," "Appellant," or "Mr. Hawkins") filed this lawsuit seeking to end the arbitrary restoration of voting rights to disenfranchised Virginians with felony convictions. Appellant has asserted two First Amendment claims under 42 U.S.C. § 1983, challenging (1) the lack of objective rules and criteria governing Defendant-Appellees Governor Youngkin and Secretary of the Commonwealth Kelly Gee's ("Appellees") selective, arbitrary re-enfranchisement system; and (2) the lack of reasonable, definite time limits by which the Governor must grant or deny a voting rights restoration application.

The district court erred when it held that the Governor's re-enfranchisement system does not qualify as a licensing scheme subject to the First Amendment unfettered discretion doctrine. Because Virginia law has created a path to restoration—an exception to the default rule of disenfranchisement upon felony

---

[1] Filed contemporaneously herewith is the parties' Joint Appendix ("JA").

conviction—a government official may not arbitrarily grant that exception by selectively permitting the disenfranchised to vote. The U.S. Supreme Court has construed the First Amendment to prohibit such unfettered discretion in licensing protected expressive conduct because it creates the risk of undetectable viewpoint discrimination. Virginia's voting rights restoration system is a de facto licensing scheme that must be invalidated under this longstanding doctrine. Accordingly, this Court should reverse.

## JURISDICTIONAL STATEMENT

This Court has jurisdiction to hear this appeal pursuant to 28 U.S.C. § 1291. The district court had jurisdiction over the underlying action under 28 U.S.C. §§ 1331, 1343, and the U.S. Constitution. On August 7, 2024, the district court entered its Final Order and Judgment for Defendants, denying Appellant's motion for summary judgment and granting Appellees' motion for summary judgment. JA373. On August 19, 2024, Appellant timely filed a notice of appeal. JA374-376.

## STATEMENT OF ISSUES

Whether the district court erred in holding that Appellees' selective re-enfranchisement system for Virginians with felony convictions is not subject to the First Amendment unfettered discretion doctrine.

## STATEMENT OF CASE

I. **Factual and legal background on felony disenfranchisement and re-enfranchisement in Virginia**

### *Legal background*

In Virginia, individuals convicted of felonies are not qualified to vote. VA. CONST. art. V, § 12; VA. CONST. art. II, § 1. Disenfranchisement for felony convictions is mandated by the Virginia Constitution: "No person who has been convicted of a felony shall be qualified to vote unless his civil rights have been restored by the Governor or other appropriate authority." VA. CONST. art. II, § 1. Article V, Section 12 of the Virginia Constitution also states that "[t]he Governor shall have power . . . to remove political disabilities consequent upon conviction for offenses committed prior or subsequent to the adoption of this Constitution . . . ." VA. CONST. art. V, § 12. Felony disenfranchisement and re-enfranchisement are also codified in Virginia statutes. Specifically, Virginia law states that "[n]o person who has been convicted of a felony shall be a qualified voter unless his civil rights have been restored by the Governor or other appropriate authority." VA. CODE ANN. § 24.2-101; *see also* VA. CODE ANN. § 24.2-427(D) (requiring cancellation of "registration of any registered voter shown to have been convicted of a felony who has not provided evidence that his right to vote has been restored").

Until the Governor restores their right to vote, Virginians with felony convictions are not qualified to vote and may not register to vote; if they willfully

do so without restoration, they commit a Class 5 felony. VA. CODE ANN. § 24.2-1016. Currently, the only person with the power to restore that statutory right or qualification to vote is the Governor. VA. CONST. art. V, § 12; VA. CONST. art. II, § 1; *see also* JA141, JA117-120; *In re Phillips*, 265 Va. 81, 87–88 (2003) ("[T]he power to remove the felon's political disabilities remains vested solely in the Governor, who may grant or deny any request without explanation, and there is no right of appeal from the Governor's decision."). Individuals seeking re-enfranchisement must complete an application and submit it to the Secretary of the Commonwealth's Restoration of Rights Office, which conducts research on applicants and submits a non-binding recommendation to the Governor. *See* JA107.

The Director of the Department of Corrections is required to notify anyone convicted of a felony of their disqualification from voting and of the procedures for applying for restoration. VA. CODE ANN. § 53.1-231.1. "The notice shall be given at the time the person has completed service of his sentence, period of probation or parole, or suspension of sentence." *Id.* The Director of the Department of Corrections is required to assist the Secretary of the Commonwealth in administering the restoration application review process. *Id.* The Secretary of the Commonwealth is instructed by statute to "maintain a record of the applications for restoration of rights received, the dates such applications are received, and the dates they are either granted or denied by the Governor" and to "notify each applicant who has filed a

complete application that the complete application has been received and the date the complete application was forwarded by the Secretary to the Governor." *Id.* Virginia law requires that complete applications be forwarded to the Governor within ninety days of receipt. *Id.*

### *Lack of objective rules, criteria, or time limits governing re-enfranchisement*

All parties agree that Virginia law does not establish any rules or criteria to govern the Governor's decision-making on voting rights restoration applications. Appellees have confirmed that, apart from federal and state constitutional constraints, "there are no rules, criteria, factors, or standards that constrain or otherwise limit, as a matter of law, the Governor's discretion to grant, deny, or take any other action on citizens' voting rights restoration applications." JA120. Furthermore, Defendants have conceded that "Virginia law does not otherwise constrain or limit the Governor's individualized discretion when deciding whether to grant a citizen's voting-restoration application." JA118-119. Nor is there any time limit by which the Governor must grant or deny an application for voting rights restoration. JA144.

Appellees have admitted that the "ultimate decision determining the outcome of an individual's voting-restoration application" is based on a "predictive judgment regarding whether an applicant will live as a responsible citizen and member of the political body," and this predictive judgment is "committed to the Governor's

discretion." JA141. Furthermore, in the words of former Secretary of the Commonwealth (and former Defendant) Kay Cole James, Appellees approach re-enfranchisement applications with a view towards "practicing grace" and "ensuring public safety." JA129.

### *Application process for voting rights restoration*

After taking office in January 2022, Governor Youngkin decided to implement his current policy regarding rights restoration. JA139. This policy was fully implemented by December 9, 2022. JA139. An updated version of the application for restoration, reflecting Governor Youngkin's policy, was made available online on December 6, 2022. JA139.

The Commonwealth's official Restoration of Rights website, where the application is publicly posted, states that "[t]o be eligible to apply for consideration for the restoration of civil rights, an individual must be free from any term of incarceration resulting from felony conviction(s)." JA140; *see also* JA105. Furthermore, in response to the Frequently Asked Question "Am I eligible to have my rights restored?", the Commonwealth's official website answers: "Governor Youngkin will consider restoration of rights for any individuals that have finished any term of incarceration as a result of a felony conviction." JA140; *see also* JA107.

Appellees have represented that their policy is that a voting rights restoration application is deemed "eligible" for the Governor's consideration and ultimate

decision to grant or deny it, unless the application was submitted by a person who is still incarcerated, a person who is currently subject to a pending felony charge, a person who is under supervised release for an out-of-state or federal conviction, or a person who does not satisfy the voting qualifications set forth by Virginia law, such as age, citizenship status, and residency requirements, or unless the application is incomplete. JA143. This definition, adopted by Appellees during this litigation, is not publicly disclosed on the Restoration of Rights website or in any other public-facing source. *See* JA105-110, JA126, JA140, JA276. Mr. Hawkins meets the definition of "eligible" Appellees have adopted during this litigation but was told that he was "ineligible at this time." *See* JA143, JA138.

Individuals seeking restoration of their voting rights must complete an application that is available in paper and electronic form on the official website of the Commonwealth of Virginia.[2] *See* JA126, JA139-140. This form is created and maintained by the Office of the Secretary of the Commonwealth in conjunction with the Office of the Governor. In addition to general biographical information, applicants must provide the following information: (i) the court of their felony conviction; (ii) whether they are a U.S. citizen; (iii) whether they have been convicted of a "violent crime"; (iv) whether they "completed serving all terms of

---

[2] OFF. OF THE SEC'Y OF THE COMMONWEALTH, RESTORATION OF RIGHTS FORM, https://www.restore.virginia.gov/media/governorvirginiagov/restoration-of-rights/pdf/ror_form.pdf (last visited Oct. 24, 2024).

incarceration"; and (v) whether they are "currently on probation, parole, or other state supervision" (and if so, the expected end date). *See* JA126, JA139-140. Applicants must also check a box indicating whether they have paid all fines, fees, and restitution or are paying fines, fees, and restitution. *See* JA126, JA139-140.

There is no restriction on what the Governor may or may not consider in making his decision to grant or deny a voting rights restoration application. Governor Youngkin considers the information the applicant records for all the fields and questions on the restoration application. JA177; *see also* JA140, JA126. Governor Youngkin has admitted that he has "the *legal* authority to ignore these factors in any particular case or to ignore them entirely. These factors do not 'limit' or 'constrain' the Governor's discretion in deciding whether to grant or deny any particular voting-restoration application." JA118-119, JA141 (emphasis in original). This is because the "ultimate decision . . . is committed to the Governor's discretion." JA118-119, JA141. In at least one instance, a prospective applicant for voting rights restoration explicitly told the Governor his political party affiliation and requested expedited review. *See* JA124 (in an email to the Governor's office, applicant stated "I am a life-long Republican who was recently released from incarceration. I have repeatedly attempted to advance my restoration of rights process using the Secretary of the Commonwealth's site only to have the website never proceed past the submit

button. How can I submit the requested information and seek an expedited review?
Please advise.").

The voting rights restoration application is reviewed for "accuracy,
completeness, eligibility, and previous restorations" by the staff of the Restoration
of Rights Division. *See* JA141. What makes a restoration application "complete" for
Governor Youngkin's consideration is not defined or otherwise specified in any
public-facing materials or on any websites. JA105-110, JA126. If there is data
missing from the application, the applicant is notified. *See* JA141. Appellees' policy
is to give each restoration applicant the opportunity to provide the missing data or
documentation. JA141. If an applicant fails to provide the missing data or
documentation, the application will not be granted. JA141. For complete voting
rights restoration applications, the Restoration of Rights Division orders criminal
record checks from the Central Criminal Records Exchange, which is run by the
Virginia State Police. *See* JA141. Additional state agencies also provide information
on applicants. *See* JA 142.

Voting rights restoration applicants who are denied are given one of three
status codes: "ineligible," "not granted at this time," or "ineligible at this time."
JA144. Applicants are not given explanations for why they have been determined to
be "ineligible" or "ineligible at this time." *See* JA131 ("The portal did not state why
I was 'ineligible' for voting rights restoration, when (if ever) my application may be

deemed eligible, or what conditions I must meet for my application to be deemed eligible."); JA133, JA135, JA137; *see also* JA275 ("Mr. Hawkins was not told why his application was deemed 'ineligible at this time,' when his application may be deemed eligible, or what conditions he must satisfy in order for his application to be deemed eligible."); JA156 (Defendants quoting *In re Phillips*, 265 Va. at 87–88, for the proposition that the Governor "may grant or deny any request without explanation . . . .").

### *Mr. Hawkins' application for rights restoration*

In 2010, Mr. Hawkins was convicted of at least one felony offense and sentenced to a term of incarceration. JA130, JA138. Because Mr. Hawkins was convicted as a juvenile, he has never been eligible to vote and has never voted in his life. JA130. He completed his term of incarceration on May 3, 2023. JA130, JA138. In early May 2023 after his release, Mr. Hawkins submitted an application for voting rights restoration, which was denied by Governor Youngkin. JA131. On June 18, 2023, Mr. Hawkins submitted a second voting rights restoration application. JA131, JA138. His application was eventually deemed "ineligible at this time," with the "date closed" listed as August 17, 2023. JA131, JA135, JA137-138. On October 4, 2023, Defendants' counsel notified the district court that they had learned that Mr. Hawkins' application had been deemed "ineligible at this time." JA46.

## II.    Procedural history

On April 6, 2023, this action commenced with two First Amendment claims challenging: (1) the lack of objective rules and criteria governing Appellees' voting rights restoration system; and (2) the lack of reasonable, definite time limits by which the Governor must grant or deny permission to vote. The operative complaint is the Second Amended Complaint, filed on July 24, 2023. JA15-39. On February 14, 2024, Plaintiff and Defendants filed cross-motions for summary judgment.[3] *See* JA266-298, JA301-324, JA250-261, JA150-172, JA185-221, JA225-247. On April 23, 2024, the district court heard oral argument. JA331-362.

On August 7, 2024, the district court denied Plaintiff's motion for summary judgment, granted summary judgment in favor of the Defendants, and entered a final order. JA363-372 (Opinion); JA373 (Final Order). On August 19, 2024, Mr. Hawkins timely filed his Notice of Appeal. JA374-376.

### SUMMARY OF ARGUMENT

Virginia law vests Governor Youngkin with exclusive, unfettered discretion to re-enfranchise individuals who are ineligible to vote due to a felony conviction. The First Amendment prohibits state government officials from arbitrarily granting

---

[3] The ECF numbers appear out of chronological order for briefs on the summary judgment motions. This is because Mr. Hawkins' motion and subsequent briefing were initially filed under seal. The district court subsequently granted in part and denied in part the motions to seal, and the parties submitted revised, redacted versions, sealing only personally identifying information. *See* JA nn. 2-5.

or denying permission to engage in political expressive conduct such as voting. Although the Fourteenth Amendment authorizes states to disenfranchise individuals with felony convictions, *Richardson v. Ramirez*, 418 U.S. 24, 54–56 (1974), once state law creates a path to regaining permission to vote—an exception to the default rule of disenfranchisement—it may not arbitrarily grant that exception and selectively confer voting rights.

Appellant has asserted two constitutional claims challenging this system. First, Governor Youngkin unlawfully grants or denies voting rights restoration applications solely based on his "predictive judgment regarding whether an applicant will live as a responsible citizen and member of the political body." *See* JA117-120, JA141; *see* JA32-35. Conditioning whether an otherwise-qualified individual may vote on this inherently subjective determination clearly violates the First Amendment unfettered discretion doctrine. Second, the lack of reasonable, definite time limits by which the Governor must render a decision violates the same. *See* JA36-38; *see also* JA144, JA176. It is beyond dispute that selectively and arbitrarily *enfranchising* Virginians in the first instance would be unconstitutional. Arbitrary *re*-enfranchisement is similarly unconstitutional, as the prefix "re-" cannot make the unlawful lawful.

Although presenting a question of first impression in this Circuit, this suit invokes a well-established First Amendment doctrine to challenge Virginia's

selective, arbitrary re-enfranchisement system. For 86 years since *Lovell v. City of Griffin*, 303 U.S. 444 (1938), the U.S. Supreme Court has prohibited the arbitrary licensing or permitting of political expression or expressive conduct within the First Amendment's protection. Because voting is a form of political expressive conduct, *see, e.g.*, *Norman v. Reed*, 502 U.S. 279, 288 (1992), state law may not confer arbitrary power on a government official to grant or deny permission to engage in that expressive conduct. Virginians with felony convictions may be disqualified from voting under *state* law, but they nonetheless retain their *federal* constitutional rights, including their First Amendment right to political expression and, therefore, are protected by the unfettered discretion doctrine. Just as state government officials may not selectively and arbitrarily enfranchise particular sixteen- or seventeen-year-olds, they also may not selectively and arbitrarily re-enfranchise individuals who are ineligible to vote due to a felony conviction.

Breaking with the U.S. Supreme Court's and this Court's First Amendment cases, the district court erred in concluding that Virginia's selective re-enfranchisement scheme does not function as a licensing system. JA370-371. In reaching this decision, the district court failed to apply a functional analysis or failed to engage in a proper functional analysis focused on the practical effects of both systems, not means or labels. Instead, the district court seized upon the undisputed fact that Appellant is currently ineligible to vote as a matter of state law and

13

concluded that the First Amendment unfettered discretion cases only apply when the plaintiff already has a "right" to engage in the specific form of political expression at issue. But this distinction proves illusory. Functionally, there is no "right" to engage in many specific, regulated forms of political expressive conduct absent government authorization. Disenfranchised Virginians are barred by state law from engaging in the specific expressive conduct of voting, but they have not lost their federal constitutional right of political expression under the First Amendment. Accordingly, they are in all material respects the same as the plaintiffs in all unfettered discretion cases who cannot lawfully engage in the expressive conduct at issue absent a license but who may nevertheless challenge the arbitrary scheme of granting or denying permission to engage in that conduct.

Ultimately, the district court erred in failing to recognize the functional equivalence of licensing systems and selective re-enfranchisement, as required by the practical, results-oriented analysis commanded by the Supreme Court for First Amendment cases. The purported distinctions upon which the district court relied are immaterial in light of this functional equivalence. To grant a license to engage in a specific form of expressive conduct and to grant a statutory right or qualification to engage in a specific form of expressive conduct (here, voting) are functionally indistinguishable. Were the district court's reasoning adopted, it would make this longstanding federal constitutional doctrine subservient to state-law semantics and

14

legal terms of art and jeopardize its application in other areas of fundamental political expression. The district court's ruling that selective, arbitrary re-enfranchisement raises no First Amendment problem cannot be reconciled with the Supreme Court's and this Court's precedents.

## ARGUMENT

### I.     Standard of Review

This Court reviews *de novo* the legal conclusions of the district court. *Belk v. Charlotte-Mechlenburg Bd. of Educ.*, 269 F.3d 305, 379 (4th Cir. 2001); *In re Brice*, 188 F.3d 576, 577 (4th Cir. 1999); *see also PBM Products, LLC v. Mead Johnson & Co.*, 639 F.3d 111, 119–20 (4th Cir. 2011) ("We review *de novo* whether the district court erred in granting summary judgment, viewing the facts and drawing all reasonable inferences therefrom in the light most favorable to [the nonmoving party]. . . . We review *de novo* awards of judgment as a matter of law."). "No deference . . . is owed to the district court on conclusions of law, including the district court's understanding of controlling law . . . ." *Belk*, 269 F.3d at 379 (citing *In re Brice*, 188 F.3d at 577).

### II.     Appellant has properly invoked the First Amendment unfettered discretion doctrine.

The district court erred in holding that the First Amendment unfettered discretion doctrine applies only if an individual is already qualified to vote. Consistent with well-established U.S. Supreme Court precedent, the First

Amendment unfettered discretion doctrine applies when an individual's qualification to vote hinges on a government official's discretionary call. To start, First Amendment protections for political expressive conduct necessarily extend to voting. And where a court finds that the government is arbitrarily authorizing or licensing protected expressive conduct and/or doing so without any definite time limits, the unfettered discretion doctrine is triggered. Additionally, Appellant's First Amendment claims protect the same interests—and safeguard against the same threats—that have long animated the First Amendment unfettered discretion doctrine. Substantively, Appellant's claims do not materially differ from any of the other canonical First Amendment unfettered discretion cases.

### A.    The First Amendment protects voting as political expressive conduct.

Voting is necessarily a form of political expressive conduct. To conclude otherwise, the Court would have to imagine there is a black hole at the center of First Amendment doctrine in the electoral context. Such a theory would posit that the political expressive conduct at the very center of our electoral system is *not* protected under the First Amendment, but *every other form* of expressive conduct, communication, advocacy, and persuasion orbiting and seeking to influence voters' political views and choices at the ballot box—from the collective to the individual, and across all actors and entities involved in democratic elections, including voters themselves—is protected. These protected forms of expression and expressive

16

conduct include but are not limited to: campaign contributions and expenditures, *see McCutcheon v. FEC*, 572 U.S. 185, 192 (2014); *Randall v. Sorrell*, 548 U.S. 230, 241–42 (2006); advocacy for the election or defeat of candidates, *see Citizens United v. FEC*, 558 U.S. 310, 326 (2010); the formation and expression of political parties, *see Colorado Republican Federal Campaign Comm. v. FEC*, 518 U.S. 604, 616 (1996) ("The independent expression of a political party's views is 'core' First Amendment activity no less than is the independent expression of individuals, candidates, or other political committees."); candidates and parties securing a spot on the ballot, *see Anderson v. Celebrezze*, 460 U.S. 780, 793–94 (1983); campaign yard signs, *see City of Ladue v. Gilleo*, 512 U.S. 43, 54–59 (1994); liking a political candidate's campaign page, *see Bland v. Roberts*, 730 F.3d 368, 386 (4th Cir. 2013), *as amended* (Sept. 23, 2013) (liking a political candidate's campaign page "is the Internet equivalent of displaying a political sign in one's front yard"); and electioneering outside a polling place, *see Burson v. Freeman*, 504 U.S. 191, 197–98 (1992). All of this protected activity is directed at influencing the expressive conduct at the center of our democracy: voting. Given this overwhelming precedent, it would be absurd to conclude that voting itself is not protected by the First Amendment; there is no void or black hole at the center of First Amendment doctrine. *See Tennessee Wine & Spirits Retailers Ass'n v. Thomas*, 588 U.S. 504,

518–19 (2019) (noting U.S. Constitution must be construed to avoid "absurd results").

The Supreme Court has long stated that when citizens express their political views and preferences at the ballot box, these votes—though secret and anonymous—are nevertheless protected by the First Amendment as political expressive conduct. *See Norman*, 502 U.S. at 288 (recognizing "the constitutional interest of like-minded voters to gather in pursuit of common political ends, thus enlarging the opportunities of all voters to express their own political preferences"); *Anderson*, 460 U.S. at 806 (evaluating burdens on "the voters' freedom of choice and freedom of association"); *Ill. State Bd. of Elections v. Socialist Workers Party*, 440 U.S. 173, 184 (1979) (describing ballot access restrictions as "impair[ing] the voters' ability to express their political preferences"); *cf. McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 341–47, 356–57 (1995) (citing "respected tradition of anonymity in the advocacy of political causes" in striking down state prohibition on anonymous campaign literature).

In these cases, the Supreme Court has repeatedly spoken of political parties' and candidates' access to the ballot and voters' expression of support for parties, candidates, and causes as two sides of the same coin. For instance, in *Anderson*, the Supreme Court held that Ohio's filing deadline for independent candidates "place[d] a particular burden on an identifiable segment of Ohio's independent-minded

*voters.*" 460 U.S. at 792 (emphasis added). As political parties' and candidates' political expression and association are protected by the First Amendment, it follows that voters' expression of support for those parties and candidates at the ballot box must also be protected by the First Amendment. *See Williams v. Rhodes*, 393 U.S. 23, 38–39 (1968) ("The rights of expression and assembly may be 'illusory if the right to vote is undermined.'") (quoting *Wesberry v. Sanders*, 376 U.S. 1, 17 (1964)).

Accordingly, the First Amendment protects voting as a form of expressive conduct, just as it protects expressions of support for candidates, parties, and causes, regardless of the format or medium. Once a court determines that the First Amendment protects a form of expressive conduct, the First Amendment unfettered discretion doctrine inexorably applies to any regulatory framework that controls permission to engage in that protected conduct. Crucially, the district court did not find that voting fails to qualify as political expressive conduct.

Moreover, voting is just one form of political expressive conduct. Disenfranchised Virginians like Mr. Hawkins may lawfully engage in many other forms of political expression but are singularly barred from expressing their political viewpoints at the ballot box. That is, they are disqualified from voting as a matter of state law, but they retain their federal constitutional right of political expression under the First Amendment.

**B.** **Plaintiff has properly invoked the First Amendment unfettered discretion doctrine.**

    *1.*    *The Supreme Court and this Court have long prohibited vesting government officials with unfettered discretion over protected expression or expressive conduct.*

Because the First Amendment protects voting as political expressive conduct and because Virginia's voting rights restoration regime controls whether a disenfranchised Virginian may engage in this protected conduct, Appellant asserted two claims under longstanding First Amendment doctrine. First, in Count One, Mr. Hawkins claimed that Virginia's voting rights restoration system functions as a licensing system governing First Amendment-protected conduct, triggering the operation of the unfettered discretion doctrine under *City of Lakewood v. Plain Dealer Publishing Co.*, 486 U.S. 750 (1988), *Forsyth County v. Nationalist Movement*, 505 U.S. 123 (1992), and related Supreme Court precedents. This prophylactic doctrine requires the invalidation of licensing schemes governing the exercise of First Amendment-protected expression or expressive conduct where officials have been vested with unfettered discretion to grant or deny the requested licenses. *City of Lakewood*, 486 U.S. at 757, 763–64. Second, in Count Two, Mr. Hawkins claimed that a lack of reasonable, definite time limits on the exercise of the licensor's discretion also violates the First Amendment. *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 226 (1990), *modified on other grounds by City of Littleton v. Z.J. Gifts D-4, LLC*, 541 U.S. 774, 775 (2004).

20

Unfettered discretion in schemes governing the exercise of protected expression or expressive conduct is per se forbidden because it subjects those seeking permission to the risk of undetectable viewpoint discrimination. *City of Lakewood*, 486 U.S. at 759; *Child Evangelism Fellowship of S.C. v. Anderson Sch. Dist. Five*, 470 F.3d 1062, 1064 (4th Cir. 2006) ("[T]he unfettered discretion conferred by district policy presents such a risk of viewpoint discrimination as to run afoul of the First Amendment."). The Supreme Court has also explained that in the absence of "standards to fetter the licensor's discretion," as-applied challenges are not viable, and the licensor's decision is "effectively unreviewable." *City of Lakewood*, 486 U.S. at 758–59. Further, where, as here, an arbitrary licensing system subjects applicants to the risk of undetectable viewpoint discrimination, applicants are pressured into self-censorship so as not to jeopardize their application. *Id.* at 759, 762–63.

No proof of actual viewpoint discrimination is required. "[A] facial challenge lies whenever a licensing law gives a government official or agency substantial power to discriminate based on the content or viewpoint of speech by suppressing disfavored speech or disliked speakers." *Id*. at 759. As the Supreme Court explained in *Forsyth County*, "[f]acial attacks on the discretion granted a decisionmaker are not dependent on the facts surrounding any particular permit decision." 505 U.S. at 133 n.10. The existence of an actual discriminatory or biased motive need not be

21

shown to strike down such a law on its face: "[T]he success of a facial challenge on the grounds that an ordinance delegates overly broad discretion to the decisionmaker rests not on whether the administrator has exercised his discretion in a content-based manner, but whether there is anything in the ordinance preventing him from doing so." *Id.*

Crucially, reviewing courts ensure that licensing systems are governed by objective rules and criteria and reasonable, definite time limits. This Court has struck down a number of such schemes for lack of these requisite safeguards against undetectable viewpoint discrimination. *See, e.g.*, *Am. Entertainers, L.L.C. v. City of Rocky Mount*, 888 F.3d 707, 720–22 (4th Cir. 2018) (holding that licensing scheme violated First Amendment by allowing police chief to deny permits if he thought a proposed business would not comply with "all applicable laws") ("[T]he denial provision vests impermissible discretion in the police chief to choose on a case-by-case basis which laws apply in reviewing a particular application and thus is too broad to survive constitutional scrutiny."); *Child Evangelism Fellowship of S.C.*, 470 F.3d at 1069–73 (holding unconstitutional provision that allowed school officials to waive space-usage fees when "determined to be in the district's best interest," finding standard both subjective and indefinite); *Child Evangelism Fellowship of Md., Inc. v. Montgomery Cnty. Pub. Schs.*, 457 F.3d 376, 387–89 (4th Cir. 2006) (invalidating policy that gave school district "virtually unlimited discretion" to

selectively grant or withdraw approval for flyers distributed to students "[b]ecause the policy offers no protection against the discriminatory exercise of [the school district's] discretion"); *Chesapeake B & M, Inc. v. Harford Cnty.*, 58 F.3d 1005, 1011 (4th Cir. 1995) (striking down licensing scheme for adult bookstores that failed to satisfy constitutional requirement that administrative decision be made within "reasonably brief time").

> 2. ***The same principles and concerns that have animated the First Amendment unfettered discretion doctrine are all implicated here.***

This appeal implicates the same concerns and principles that have animated the unfettered discretion doctrine for 86 years. Disenfranchised individuals submit an application for permission to vote, and no rules or criteria govern Governor Youngkin's decision to grant or deny that application. Appellees admit this—and even *embrace* this as a feature, not a bug, of their system. *See supra* at 5–6; JA140-141. Arbitrary re-enfranchisement survives in Virginia as a vestige of two overlapping legal regimes: (1) discretionary executive clemency, which originates with the 8th century English monarchy;[4] and (2) disenfranchisement upon a felony

---

[4] *See Herrera v. Collins*, 506 U.S. 390, 412 (1993) ("In England, the clemency power was vested in the Crown and can be traced back to the 700's. W. Humbert, The Pardoning Power of the President 9 (1941). Blackstone thought this 'one of the great advantages of monarchy in general, above any other form of government; that there is a magistrate, who has it in his power to extend mercy, wherever he thinks it is deserved: holding a court of equity in his own breast, to soften the rigour of the

conviction.[5] Appellees have sought to immunize their voting rights restoration from constitutional scrutiny by labeling it "clemency," which, as they note, is based "'on purely subjective evaluations and on predictions of future behavior by those entrusted with the decision.'" JA161 (quoting *Connecticut Bd. of Pardons v. Dumschat*, 452 U.S. 458, 464 (1981)). On this point at least, the district court agreed with Appellant that the "clemency" label offers no blanket defense to Appellees. JA366-368.

Deciding whether to grant or deny an application to engage in expressive conduct protected by the First Amendment based on an undefined "responsible citizen" test is wholly subjective and arbitrary. *See* JA141; *see also* JA118-120 (admitting "ultimate decision determining the outcome of an individual's voting-restoration application—the predictive judgment regarding whether an applicant will live as a responsible citizen and member of the political body—is committed to the Governor's discretion"). This is exactly what the First Amendment unfettered discretion doctrine forbids. *See Shuttlesworth v. City of Birmingham*, 394 U.S. 147,

---

general law, in such criminal cases as merit an exemption from punishment.' 4 W. Blackstone, Commentaries.").

[5] Although both executive clemency and felony disenfranchisement are, in themselves, constitutional, their conjunction in discretionary and arbitrary voting rights restoration has produced a narrow, yet significant, constitutional violation. *Cf. West Lynn Creamery, Inc. v. Healy*, 512 U.S. 186, 199–201 (1994) (finding two otherwise-lawful government actions, nondiscriminatory tax and local subsidy program, may prove unconstitutional when combined).

150–53 (1969) (invalidating permit scheme for marches or demonstrations that lacked "narrow, objective, and definite standards" and was "guided only by [Commissioners'] own ideas of 'public welfare, peace, safety, health, decency, good order, morals or convenience'"); *Child Evangelism Fellowship of S.C.*, 470 F.3d at 1069 (holding unconstitutional provision that allowed school officials to waive space-usage fees when "determined to be in the district's best interest," because standard was "an apparent carte blanche" that was "as subjective a notion as good government, good taste, or good character").

Under Virginia's purely discretionary vote-licensing system, a governor may review any information on the applicant's political viewpoints, including campaign donations, previous registration history, and social media posts, and selectively grant or deny applicants based on those viewpoints without ever disclosing these discriminatory or biased motives. Some applicants will even signal their political affiliations or viewpoints obliquely or even blatantly state their political alignment with the current governor to try to influence the ultimate decision. *See* JA124 (in an email to the Governor's office, applicant stated "I am a life-long Republican who was recently released from incarceration"). Nothing in Virginia's current system prevents a governor from granting an application solely based on the applicant's actual or perceived partisan affiliation.

On the flip side, such a scheme risks *deterring* current or future restoration applicants from publicly expressing certain political viewpoints that might jeopardize any pending or future attempt to secure the Governor's permission to vote. *See Child Evangelism Fellowship of S.C*, 470 F.3d at 1068 ("In a standardless environment, speakers might engage in self-censorship out of fear they would be discriminated against based upon their views." (citation omitted)). The ballot may be secret, but applicants' political views are just a Google, social media, or database search away. By reviewing prior political expression, partisan affiliations, or donation history, a governor can assess how applicants would likely vote if restored. *See City of Lakewood*, 486 U.S. at 759 ("[T]he licensor does not necessarily view the text of the words about to be spoken, but can measure their probable content or viewpoint by speech already uttered.").

To see this, this Court need only consider a voting rights restoration applicant with a social media presence filled with claims that the 2020 presidential election was stolen and expressing support for those convicted in connection with January 6, or an applicant who publicly states they are for or against a nationwide ban on abortion. Nothing in Virginia law prevents a Governor from secretly discriminating against such applicants and, in the absence of rules and criteria, it is impossible to prove intentional viewpoint discrimination in an as-applied challenge. *Id.* at 758–59. Additionally, some applicants will hold the above beliefs but will self-censor

because their application is pending with a governor known to have opposing political views. Therein lies the constitutional violation: "The mere existence of the licensor's unfettered discretion, coupled with the power of prior restraint, intimidates parties into censoring their own speech . . . ." *Id.* at 757. Proof of invidious discrimination is not required, as the Supreme Court has instructed that unfettered discretion is per se prohibited, "even if the discretion and power are never actually abused." *Id.*; *see also Child Evangelism Fellowship of S.C*, 470 F.3d at 1072 (rejecting school district's argument that its policy should stand because its decisions were content-neutral, even though policy gave it complete discretion).

For the foregoing reasons, Virginia's system of selectively, arbitrarily re-enfranchising people with felony convictions violates the First Amendment unfettered discretion doctrine.[6]

---

[6] A decision in Appellant's favor would also align with the Supreme Court's decision in *Minnesota Voters Alliance v. Mansky*, 585 U.S. 1 (2018). The Court invalidated a state statute on First Amendment grounds because it failed to specify when the content of a badge, button, or insignia worn by a voter would be impermissibly "political." *Id.* at 21–22. By vesting election judges with such open-ended discretion, the statute created an unacceptable risk of covert, undetectable viewpoint discrimination. *Id.* (citing *Heffron v. Int'l Soc. for Krishna Consciousness, Inc.*, 452 U.S. 640, 649 (1981) (warning of the "more covert forms of discrimination that may result when arbitrary discretion is vested in some governmental authority")).

## III.   The district court erred in ruling that the First Amendment unfettered discretion doctrine does not apply to Virginia's selective, arbitrary re-enfranchisement system.

The district court erred in ruling that Virginia's re-enfranchisement system does not qualify as a licensing system and that the unfettered discretion doctrine does not apply. In answering this threshold question, the district court failed to follow the Supreme Court's instructions to apply a *functional* analysis in First Amendment cases. Despite acknowledging the procedural similarities, the district court erroneously elevated means above ends and did not accord sufficient weight to the identical features and practical outcomes of a licensing scheme and selective, arbitrary re-enfranchisement. It does not matter whether the official preauthorization to engage in political expression is called a "right" or a "license" when the re-enfranchisement and licensing are functionally identical. The purported distinctions the district court relied upon are immaterial in light of this functional equivalence. Further, the district court placed undue weight on the decision in *Lostutter v. Kentucky*, No. 22-5703, 2023 WL 4636868 (6th Cir. July 20, 2023), *cert. denied sub nom. Aleman v. Beshear*, 144 S. Ct. 809 (2024), which failed to engage in a proper functional analysis of these First Amendment claims.

### A.   First Amendment cases must be analyzed functionally.

For decades, the Supreme Court has held that First Amendment rights and doctrines must be evaluated functionally, not formalistically. Across various First

Amendment precedents and doctrines, the governing tests or frameworks always turn on functional analyses. *See, e.g.*, *Garcetti v. Ceballos*, 547 U.S. 410, 424–25 (2006) (in First Amendment retaliation claim implicating question as to whether public employee had spoken as government employee or private citizen, noting "proper inquiry is a practical one" and "[f]ormal job descriptions" are not dispositive); *Press-Enter. Co. v. Superior Ct.*, 478 U.S. 1, 7–10 (1986) (recognizing qualified First Amendment right of access to preliminary hearings) ("[T]he First Amendment question cannot be resolved solely on the label we give the event, *i.e.*, 'trial' or otherwise, particularly where the preliminary hearing functions much like a full-scale trial."); *Branti v. Finkel*, 445 U.S. 507, 518–19 (1980) (holding First Amendment bars conditioning public defenders' continued employment upon affiliation with political party controlling county government) ("[T]he ultimate inquiry is not whether the label 'policymaker' or 'confidential' fits a particular position . . . ."); *Bigelow v. Virginia*, 421 U.S. 809, 818–26 (1975) (recognizing First Amendment protects commercial advertisements) ("Regardless of the particular label asserted by the State—whether it calls speech 'commercial' or 'commercial advertising' or 'solicitation'—a court may not escape the task of assessing the First Amendment interest at stake and weighing it against the public interest allegedly served by the regulation."); *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 67 (1963) ("We are not the first court to look through forms to the substance and recognize that

informal censorship may sufficiently inhibit the circulation of publications to warrant injunctive relief."); *see also Lebron v. Nat'l R.R. Passenger Corp.*, 513 U.S. 374, 392–93 (1995) ("The Constitution constrains governmental action by whatever instruments or in whatever modes that action may be taken. . . . And under whatever congressional label.") (citation omitted).

Similarly, this Court has used a flexible, functional approach in engaging in forum analysis in First Amendment cases. In *Child Evangelism Fellowship of S.C.*, a First Amendment challenge to a fee waiver system, this Court took a functional approach in construing a fee waiver as a de facto "speech subsidy" and therefore, finding that "the waiver system constitutes the relevant forum." 470 F.3d at 1069.

In the election law context, the Supreme Court has approached many First Amendment challenges to campaign finance regulations using a functional approach. After *Buckley v. Valeo*, 424 U.S. 1, 12–59 (1976), the Supreme Court flexibly applied the dichotomy between contributions and expenditures to prevent the evasion of contribution limits. In *Colorado Republican Federal Campaign Committee v. FEC*, 518 U.S. 604, 616–18 (1996) ("*Colorado RFCC I*"), the spending limits set by the Federal Election Campaign Act were found unconstitutional where "the expenditures at issue were *not potential alter egos for contributions*, but were independent and therefore *functionally true expenditures* . . . ." *FEC v. Colorado Republican Federal Campaign Comm.*, 533

U.S. 431, 463 (2001) ("*Colorado RFCC II*") (emphasis added). Then, in upholding the facial constitutionality of coordinated party expenditure limits against the First Amendment challenge in *Colorado RFCC II*, the Supreme Court once again took a practical view of the regulated conduct and found "no significant functional difference between a party's coordinated expenditure and a direct party contribution to the candidate . . . ." *Id.* at 464. Such pragmatic assessments were necessary "to minimize circumvention of contribution limits." *Id*. at 465.

Functional equivalence is regularly invoked as the standard in First Amendment cases because of the fundamental importance of the right to political expression or expressive conduct and the risk that an unconstitutional regulation may evade a formalistic test's detection. For example, the Supreme Court's decision in *FEC v. Wisconsin Right to Life, Inc.*, 551 U.S. 449 (2007) ("*WRTL*") held that distinguishing between campaign advocacy and issue advocacy "requires [courts] first to determine whether the speech at issue is the 'functional equivalent' of speech expressly advocating the election or defeat of a candidate for federal office, or instead a 'genuine issue a[d].'" *Id*. at 456 (citations omitted). The regulatory scheme and multi-factor balancing test developed in the wake of *WRTL* would be revisited by the Supreme Court in *Citizens United*, 558 U.S. at 334–35 (citing *WTRL*, 551 U.S. at 470). Once again, the U.S. Supreme Court evaluated that regulatory framework from a functional perspective and focused on the law's practical

31

consequences. The majority wrote that even though this regulatory scheme would not qualify as "a prior restraint on speech in the strict sense of that term," it was inescapable that

> [a]s a practical matter, . . . given the complexity of the regulations and the deference courts show to administrative determinations, a speaker who wants to avoid threats of criminal liability and the heavy costs of defending against FEC enforcement must ask a governmental agency for prior permission to speak. *These onerous restrictions thus function as the equivalent of prior restraint by giving the FEC power analogous to licensing laws implemented in 16th- and 17th-century England*, laws and governmental practices of the sort that the First Amendment was drawn to prohibit.

*Citizens United*, 558 U.S. at 334–35 (internal citations omitted, emphasis added).

*Citizens United*, therefore, accords with the long line of precedents in which the Supreme Court has resolved First Amendment cases across a wide spectrum of doctrines using a functional lens, not a formalistic litmus test.

Moreover, no matter the area of law, a proper functional analysis requires a specific *evaluation of practical effects or outcomes*. For instance, in *Quackenbush v. Allstate Insurance Co.*, the Supreme Court held that a remand order was appealable, even though such orders "do not meet the traditional definition of finality." 517 U.S. 706, 715 (1996). Nonetheless, this difference was immaterial because the remand order was "functionally indistinguishable" from a stay order the Court had previously found appealable in another case. *Id.* at 714–15. Like a stay order, a remand "puts the litigants . . . effectively out of court, and its *effect* is

32

precisely to surrender jurisdiction of a federal suit to a state court." *Id.* (citations omitted, emphasis added). The Supreme Court's focus on practical effects—properly privileging ends over means—is what a functional analysis requires.

But in this case, the district court's decision has upended that framework and failed to give due weight to the practical, substantive effects of Governor Youngkin's grants and denials of voting rights restoration applications. The district court acknowledges the procedural similarities between licensing and Virginia's selective re-enfranchisement regime. JA370. But in two short paragraphs, citing only a single legal authority, the district court summarily concludes that licensing "function[s] to regulate an existing right and [the rights restoration system] exists to aid Governor Youngkin in assessing whether a candidate deserves restoration of a right he has lost." JA370-371.

However, the court failed to consider the practical outcomes of licensing and selective re-enfranchisement vis-à-vis political expressive conduct. Instead, the district court resorts to formalism and, in conclusory fashion, holds that Mr. Hawkins lacks an "underlying right" the way license applicants in the First Amendment unfettered discretion cases have a "right to free speech." JA371. But this conclusion ignores the practical reality that, in both contexts, there is a right to political expression under the First Amendment, and what disenfranchised people with felony convictions lack is qualification to vote. One may call that state-law qualification a

33

"right" or a "license" but either way, it functions exactly like a license or permit scheme with respect to this *specific form* of political expression. An applicant who has a constitutional right to political expression—but no per se "right" to engage in a particular means of expressive conduct—must apply for and obtain official preauthorization.

The district court's analysis of the "decision stage" in re-enfranchisement essentially restates the same formalistic analysis of the preceding paragraph. JA371. In the court's view, whereas "the disenfranchised felon regains his previously lost right,"

> in the speech-licensing cases, administrators who granted applicants' licenses confirmed how, when, and where those applicants could engage in their right to free speech. In short, the speech-licensing cases describe systems that function to regulate how a person can exercise[] an existing right.

JA371. But this formalistic comparison again assumes what is in dispute. It assumes, without citation to any Supreme Court or Fourth Circuit precedent, that what matters for the First Amendment unfettered discretion analysis is the applicant's status quo *ex ante*. By seizing on the term "right," the district court concludes it is different from a "license." But that undue reliance on two legal terms of art is legally erroneous here, where the Supreme Court's analysis calls for a functional approach. Both the disenfranchised and the aspiring licensee seek to engage in political expression, need a government body or official's approval to do so, cannot lawfully

do so without that permission, and can do so once that permission is granted. The systems cause the same practical outcome. The district court failed to properly weigh these functional commonalities and, therefore, failed to engage in the kind of analysis the Supreme Court has commanded for First Amendment cases.

**B.    Even if this Court finds the district court engaged in a functional analysis, it nonetheless erred in failing to consider the practical effects of Virginia's selective voting rights restoration system.**

Given this consistent precedent, the district court was required to apply a functional analysis in assessing whether Appellant may invoke the First Amendment unfettered discretion doctrine. The district court ultimately failed to give due weight to the identical results produced by a licensing scheme and Virginia's selective re-enfranchisement system. Functionally, there is no material difference between the two systems in both their mechanics and outcomes:

- Disenfranchised individuals with any felony conviction must apply to a government office seeking permission to vote. JA139-140.

- An individual applies for a license to engage in expressive conduct, and a state official selectively and arbitrarily grants or denies that license. If denied, the applicant can reapply. JA146, JA159; *see also* JA135-137 ("If your circumstances have changed from the date the record was closed, you may request restoration using the button below. A change

in circumstance may include . . . not meeting the restoration criteria at the time you applied.").

- Governor Youngkin has sole and unlimited discretion to decide whether to grant or deny that permission to these individual applicants. JA141.

- Further, absent this license from the Governor, the applicant may not lawfully engage in this form of political expressive conduct: Virginians with felony convictions may not register and vote prior to restoration, and if an individual with a felony conviction willfully registers to vote prior to restoration, that is a Class 5 felony. VA. CODE ANN. § 24.2-1016.

Even the Sixth Circuit in *Lostutter*, which ruled against the plaintiffs, acknowledged that "the result of the felon reenfranchisement scheme is that a felon is 'allowed' to vote again, where previously prohibited. And the result of a license or permit is that a person is 'allowed' to engage in regulated conduct, where they were previously prohibited." 2023 WL 4636868, at *6. Accordingly, Virginia's selective re-enfranchisement system has all the hallmarks of a licensing scheme governing expressive conduct and has the same practical outcomes. This is dispositive under the Supreme Court's results-oriented functional analysis.

Nevertheless, the district court ignored or discounted these significant functional commonalities and concluded that, because disenfranchised Virginians with felony convictions are ineligible to vote as a matter of *state* law, they cannot assert that selective re-enfranchisement functions as a licensing scheme. JA370-371. Essentially, the district court found that the only individuals who enjoy and may vindicate rights under the First Amendment unfettered discretion doctrine are those who are applying for a specific time slot, place, and manner for their expressive conduct but otherwise enjoy an abstract "right" to engage in that conduct. Under this exceedingly narrow interpretation of the First Amendment cases Appellant has cited, the unfettered discretion doctrine cannot be invoked by an individual seeking threshold permission to engage in expressive conduct. However, the Supreme Court has never adopted such a formalistic, restrictive view of this doctrine, and it should be rejected for several reasons.

### 1.     There is no functional difference between granting (or re-granting) a "right" or a "license" to exercise specific, regulated forms of political expressive conduct.

*First*, the formalistic distinction between an official granting a "right" or granting a "license" to engage in specific forms of expressive conduct vanishes upon inspection. This is especially true where the specific form of political expression or expressive conduct is highly regulated (*i.e.* a march down city streets, billboards, specialty license plates, or voting). Nonetheless, the district court dismissed this

argument by characterizing these First Amendment unfettered discretion precedents as "speech-licensing cases" in which courts "assess[ed] schemes that regulate individuals' ability to exercise their rights to free speech." JA370; *see also* JA371 ("In short, the speech-licensing cases describe systems that function to regulate how a person can exercise[] an existing right.").

But in many instances, the "right to free speech" is no right at all without a license or permit. People who wish to exercise their "rights" under the First Amendment typically must contend with a multitude of state laws and local ordinances and obtain a license or permit to engage in the specific form of political expression or expressive conduct, and are by no means guaranteed to obtain official approval. Every plaintiff who has ever invoked the First Amendment unfettered discretion doctrine has lacked a *present* "right" to engage in the specific form or type of political expression or expressive conduct. Indeed, that is why they are applying for a permit or were fined or prosecuted for engaging in the conduct without a license. *See, e.g.*, *City of Lakewood*, 486 U.S. at 755–56 (collecting cases). Such litigants have only an abstract "right" under the First Amendment to speak with an amplifier, lead a demonstration with tens of thousands of marchers down Main Street, or distribute newspapers throughout a city, because without a permit or license issued under a city ordinance, the individual cannot engage in any of these activities lawfully and would face a fine or criminal charges if they did so. There is

no right, for instance, to put up a billboard, obtain a specialty license plate, or distribute flyers in a public school to convey a political message. *See Van Wagner Bos., LLC v. Davey*, 770 F.3d 33, 38 (1st Cir. 2014) (holding unfettered discretion doctrine applies to billboard licensing scheme); *Roach v. Stouffer*, 560 F.3d 860, 869–70 (8th Cir. 2009) (striking down specialty license plate program for unfettered discretion); *Child Evangelism Fellowship of Md., Inc.*, 457 F.3d at 387–89. There is a constitutional right to political expression, but often not to the *specific form* of political expression. That voting rights restoration applicants are ineligible to vote is not materially different from the fact that prospective licensees would be arrested or fined if they engaged in a *specific form* of expressive conduct without the prerequisite government authorization.

### 2. The purported distinctions the district court cites are immaterial to the functional analysis.

*Second and relatedly*, the distinctions upon which the district court relied are immaterial in light of the functional equivalence between licensing and selective re-enfranchisement. The district court asserts that licensing schemes "function[] to regulate an existing right," whereas voting rights restoration "exists to aid Governor Youngkin in assessing whether a candidate deserves restoration of a right he has lost." JA370-371. The court continued: "In the [First Amendment] cases above, at the first step, applicants asked government officials for licenses to exercise their right to free speech. Here, Hawkins has no similar underlying right." JA371.

39

However, with respect, this framing misconstrues the doctrine. The question is not whether Mr. Hawkins has any "underlying right" under state law to vote, *see* JA371; it is whether, as a matter of First Amendment doctrine, a system marked by applicants asking government officials for permission to vote is materially or functionally different from applicants asking government officials for permission to engage in any other *specific form* of political expression. The district court's reasoning places all its weight on the undisputed fact that Mr. Hawkins is not *currently* entitled to vote as a matter of *state* law but ignores that he retains his *federal* constitutional right to political expression. If what the district court means by "underlying right" is a right under the U.S. Constitution, then Mr. Hawkins does have a First Amendment right to political expression.

With respect to the *federal* constitutional doctrine at issue, the problem is that Virginia's re-enfranchisement regime infringes Appellant's First Amendment rights by giving Governor Youngkin the power to selectively authorize this *specific form* of political expression. And as previously discussed, there is no material, functional difference between conferring a "right" to exercise a specific, regulated form of political expression and granting (or re-granting) a "license" to engage in the same. For all intents and purposes, selectively granting re-enfranchisement or a license— and on the reverse side of the coin, denying permission to engage in this or any other specific, regulated form of political expression—has the same practical effect.

40

The district court's key error is that it uses the imprecise phrase "underlying right" and thereby fails to distinguish between the constitutional right of political expression and "rights" to engage in specific expression that arise under statutes or ordinances. Mr. Hawkins has the former but not the latter.

For example, in *Roach*, the Eighth Circuit ruled in favor of a pro-life group in its facial First Amendment challenge to Missouri officials' "unbridled discretion" in administering a specialty license plate program. 560 F.3d at 860, 869–70. No one has a First Amendment "right" to a specialty license plate, but such a program nonetheless indisputably constitutes a licensing scheme governing political expression. A specialty license plate applicant's right to free speech under the First Amendment is quite abstract, as this form of political expression is highly regulated and can be denied altogether without running afoul of the First Amendment. But if a specialty license plate program is created, then it may not be administered with unfettered official discretion. *See City of Lakewood*, 486 U.S. at 766 (noting that "in a host of other First Amendment cases," Supreme Court has rejected "'greater-includes-the-lesser'" argument and invalidated arbitrary licensing schemes with "open-ended discretion . . . even where it was assumed that a properly drawn law could have greatly restricted or prohibited the manner of expression"). The same is true for billboards and many other forms of protected expression or expressive conduct. Similarly, Virginians are qualified to vote by way of state statutes, and

voting is highly regulated. All Virginians with felony convictions could be uniformly and permanently barred from voting for life, consistent with the First Amendment, but arbitrarily granting permission to vote triggers the unfettered discretion doctrine.

Ultimately, the two scenarios—licensing and selective re-enfranchisement—are functionally indistinguishable. The pro-life group in *Roach* had many other ways to express its political message; had no right to a pro-life specialty license plate; but if state law creates a specialty license plate program, then, under the First Amendment, it must not be subject to a government official's unfettered discretion. Likewise, disenfranchised pro-life voters have many other ways to express their support for pro-life candidates or ballot initiatives; have no right to vote for a pro-life candidate or constitutional amendment; but if the state creates a system of granting the disenfranchised permission to vote, then, under the First Amendment, it must not be subject to a government official's unfettered discretion. The district court failed to recognize this functional commonality because it did not fully reckon with two key realities: (a) voting is one of many forms of political expression, *see* Section I.A; and (b) disenfranchised individuals have not lost their "underlying right" of political expression under the First Amendment, just their state-law qualification to engage in this specific form of political expression. In categorically suspending the franchise for people with felony convictions and then selectively permitting disenfranchised individuals to vote, Appellees' system operates as the

functional equivalent of a licensing scheme for a specific form of political expression.

> **3.     Similarly, the district court's attempt to limit the unfettered discretion doctrine to time, place, and manner regulations must also fail.**

*Third*, to the extent the district court is reading the First Amendment unfettered discretion cases as solely concerning regulatory schemes that govern the time, place, and manner of—but not the right—to expression or expressive conduct, JA368-371, this interpretation should be rejected for the same reasons recounted above. The district court found the voting rights restoration is not licensing because the "rights restoration system . . . has a different function: it determines who can reenter the franchise." JA371. As to First Amendment-protected expression of support for a particular political cause or candidate, Virginia's selective re-enfranchisement system is no less a *manner* regulation than the specialty license plate program or a billboard licensing scheme. Disenfranchised individuals have many ways to express their political views and preferences but are selectively granted or denied this particular method of expressive conduct in violation of the First Amendment. *See Heffron v. Int'l Soc'y for Krishna Consciousness, Inc.*, 452 U.S. 640, 649 (1981) (noting arbitrariness is "inherently inconsistent with a valid time, place, and manner regulation because such discretion has the potential for becoming a means of suppressing a particular point of view").

The district court's opinion fails to explain why, as a functional matter, arbitrary decisions as to who may "reenter the franchise" do not implicate the same fundamental concerns at the heart of this First Amendment doctrine. JA371. That is, the court does not explain why the Governor's uncontrolled discretion to permit or deny Virginians the ability to express their political views in the *manner* of voting would not bear the same inherent risk of viewpoint discrimination. A more faithful reading of the Supreme Court's precedents in this space, in keeping with the directive to analyze First Amendment disputes functionally, would conclude that this risk inheres in *any* regulatory framework affording government officials sole and absolute power to bestow voting rights selectively, notwithstanding any formalistic labels or terms of art state law might affix.

> **4.     *The district court's reasoning would make a federal constitutional doctrine subservient to arbitrary state-law terms and labels.***

*Fourth*, the district court's conclusion would make a *federal* constitutional doctrine hinge upon the semantics of *state* law on voting qualifications. It appears that the district court would agree that if a state legislature enacted a law requiring "qualified" voters (who are U.S. citizens, at least 18 years old, Virginia residents, and not currently disenfranchised for any reason, *see* VA. CONST. art. II, § 1) to apply for and secure a government official's discretionary permission in order to cast a ballot, this would be the functional equivalent of a licensing scheme and violate the

First Amendment. To be clear, these individuals would *not* be allowed to vote until they obtained that license or permit from that state official; they would be technically "qualified" to vote, subject to passing the final test of securing the Governor's blessing. Under the district court's reasoning, because the aspiring voter in this scenario meets the statutory "qualifications" for voting, a plaintiff could challenge the superimposed administrative application process as functionally the equivalent of an arbitrary licensing regime prohibited by the First Amendment unfettered discretion doctrine.

However, the district court reasoned that because people with felony convictions are deemed not "qualified" for voting purposes under Virginia law, Appellees' selective re-enfranchisement system does *not* function as a licensing regime. JA370-371. By this logic, the federal constitutional doctrine would be triggered (or not)—*i.e.*, the system would or would not be a "licensing" system—depending on whether state law merely labels a person "qualified" or "not qualified" to vote at the time they must seek the governor's permission to vote. But such a superficial trigger runs contrary to a functional analysis. Functionally, the outcome in both scenarios is exactly the same: individuals *cannot* vote without a government official's permission and *can* vote once that government official grants permission. Under a system in which a single government official has the power to qualify a person as a voter, there is no material difference between conferring a "license" or

"permission" to vote, "qualifications" to vote, or the "right" to vote. And Virginia law does not speak of any "right" to vote, but rather only of the "[q]ualifications of voters" and "qualified voter[s]." VA. CONST. art. II, § 1, VA. CODE ANN. § 24.2-101.

In essence, the district court's reasoning would make a bedrock, longstanding federal constitutional doctrine subservient to arbitrary state-law labels and give de facto licensing regimes with uncontrolled discretion an end run around the First Amendment if the legislature or city council cleverly chooses its terms. U.S. CONST. art. VI, cl. 2; *Harris v. Quinn*, 573 U.S. 616, 642 n.10 (2014) ("Our decision rests in no way on state-law labels. . . . Indeed, it is because the First Amendment's meaning does not turn on state-law labels. . . ."); *National Ass'n for Advancement of Colored People v. Button*, 371 U.S. 415, 429 (1963) ("[A] State cannot foreclose the exercise of constitutional rights by mere labels."); *cf. O'Hare Truck Serv., Inc. v. City of Northlake*, 518 U.S. 712, 722 (1996) ("We see no reason, however, why the constitutional claim here should turn on the distinction . . . . Recognizing the distinction in these circumstances would invite manipulation by government, which could avoid constitutional liability simply by attaching different labels to particular jobs.") (citation omitted). This interpretation misreads the Supreme Court's First Amendment cases, which have always cautioned against rigid formalism and instead have commanded a functional, flexible approach so that creative maneuvering does not evade this fundamental First Amendment protection.

To see the arbitrariness of allowing state-law terms to control this federal constitutional doctrine, one need only consider a different group of people who are not qualified to vote in Virginia: sixteen- and seventeen-year-old U.S. citizens. If Virginia law gave Governor Youngkin unlimited discretion to selectively grant or deny sixteen- and seventeen-year-old U.S. citizens permission to vote upon the submission of applications accompanied by high school transcripts or essays on American government, the state would clearly be issuing licenses to vote, regardless of the applicants' *ex ante* status. So too with the selective enfranchisement of currently ineligible individuals with felony convictions, notwithstanding the superficial categorization of such enfranchisement as "rights restoration" or "clemency."

### 5. There is no functional difference between granting, terminating, and reactivating or re-granting permission to engage in expressive conduct.

*Fifth and finally*, licenses can be granted, revoked, and re-granted or reactivated. So too with enfranchisement, disenfranchisement, and re-enfranchisement. For First Amendment purposes, there is no functional, legally meaningful distinction between arbitrary enfranchisement, arbitrary disenfranchisement, and arbitrary re-enfranchisement—granting a license, terminating a license, or reactivating or re-granting a license. *See, e.g.*, *Epona v. County of Ventura*, 876 F.3d 1214, 1221 (9th Cir. 2017) (holding that facial

unfettered discretion challenge is cognizable "to the extent that the scheme g[i]ve[s] permitting officials unbridled discretion to grant or revoke permits" (citing *Kaahumanu v. Hawaii*, 682 F.3d 789, 802 (9th Cir. 2012))); *Van Wagner Bos., LLC*, 770 F.3d at 39–40 ("Because the revocation of a permit prevents a billboard owner from engaging in further protected expression, those provisions pose the same potential threat as the provisions governing the granting and renewal of permits."); *Gasparo v. City of New York*, 16 F. Supp. 2d 198, 207–16, 221–23 (E.D.N.Y. 1998) (issuing preliminary injunction against unfettered administrative discretion to terminate permits). U.S. citizens who satisfy certain conditions are licensed to vote, and then that license is functionally suspended upon felony conviction. Therefore, re-enfranchisement constitutes an act of re-granting a license to vote that is not functionally different from other administrative licensing regimes. Just as selective, arbitrary enfranchisement and selective, arbitrary disenfranchisement indisputably would violate the First Amendment unfettered discretion doctrine, so too does selective, arbitrary *re*-enfranchisement.[7]

---

[7] Similarly, equal protection cases decided by the circuit courts have drawn no distinctions between enfranchisement, disenfranchisement, and re-enfranchisement. *See Owens v. Barnes*, 711 F.2d 25, 26–27 (3d Cir. 1983) ("[T]he state could not disenfranchise similarly situated blue-eyed felons but not brown-eyed felons."); *Williams v. Taylor*, 677 F.2d 510, 515–17 (5th Cir. 1982) (remanding for trial on challenge to "selective and arbitrary enforcement of the disenfranchisement procedure"); *Shepherd v. Trevino*, 575 F.2d 1110, 1114 (5th Cir. 1978) ("No one would contend that section 2 permits a state to disenfranchise all felons and then

Accordingly, arbitrary *re-enfranchisement* should not survive First Amendment scrutiny simply based on the "re" prefix. That individuals disenfranchised by felony conviction once had but lost their statutory right to vote under state law does not change the fact that the First Amendment unfettered discretion doctrine is violated by arbitrarily licensing a specific form of expressive conduct. For purposes of such claims, there can be no meaningful distinction between granting a license in the first instance or reactivating or re-granting a license.[8]

\*                    \*                    \*

Accordingly, the district court erred in failing to focus on the practical effects of Appellees' restoration system, relying instead upon purported distinctions and labels that do not reflect any material difference. Setting these aside, it is clear that selective, arbitrary re-enfranchisement in Virginia functionally operates as a licensing scheme.

---

reenfranchise only those who are, say, white."); *id.* ("Nor can we believe that section 2 would permit a state to make a completely arbitrary distinction between groups of felons with respect to the right to vote."); *Harvey v. Brewer*, 605 F.3d 1067, 1079 (9th Cir. 2010) (noting a state cannot arbitrarily "re-enfranchise only those felons who are more than six-feet tall").

[8] With respect to those convicted as juveniles such as Mr. Hawkins, voting rights "restoration" has no retrospective effect. Disenfranchised individuals who were convicted of felonies as juveniles never could vote. For them, voting rights "restoration" is functionally first-time enfranchisement.

**C.    The district court's reliance on the Sixth Circuit's decision in *Lostutter* was misplaced.**

The district court relied in part on *Lostutter v. Kentucky*, but with respect, that decision improperly relied upon the "partial pardon" label for restoration under Kentucky law and thereby ran afoul of the Supreme Court's longstanding directive to engage First Amendment rights cases with a functional perspective. 2023 WL 4636868, at *3–6. The Sixth Circuit panel's summary betrays this central error:

> Mere similarity in result does not change the nature of the vehicle used to reach that result, and Kentucky law is clear that it restores felons their voting rights through a partial executive pardon, not through the granting of an administrative license. . . . So, regardless of any similarity in outcome—in that a pardoned felon and a licensed civilian may both engage in conduct previously forbidden—the vehicles to achieve that outcome remain fundamentally different.

*Id*. at *6. The panel's conclusion that the "nature of the vehicle" was dispositive— and not the "result" or "outcome"—lacked legal support and directly contradicted the litany of Supreme Court precedents forbidding formalistic analysis and requiring a practical, functional inquiry in a wide spectrum of First Amendment contexts. The panel's focus on the purported "nature of the vehicle" erroneously privileged means over ends and minimized or ignored the practical effects of Kentucky's voting rights restoration system.[9]

---

[9] The district court does not cite any specific reasoning in the stay order in *Hand v. Scott*, 888 F.3d 1206 (11th Cir. 2018) that supports its conclusion, quoting only the motions panel's preliminary view that the First Amendment unfettered discretion

50

Appellees have also characterized *Lostutter* as "a nearly identical challenge," JA166, but carefully omit an important distinction between Kentucky law and Virginia law. Whereas Kentucky law classifies voting rights restoration as a "partial pardon," KY. REV. STAT. § 196.045(1)(e), Virginia law and even the current rights restoration form implemented by Appellees expressly disclaim that voting rights restoration is in any way a pardon. Appellees' restoration application form expressly states at the bottom: "This is not a pardon . . . ." JA126. This disclaimer mirrors the Supreme Court of Virginia's jurisprudence in this area which refers to voting rights restoration and pardons as distinct executive actions. *See Howell v. McAuliffe*, 292 Va. 320, 337 (2016) ("Never before, however, have any of the prior 71 Virginia Governors issued a sua sponte clemency order of any kind, *whether to restore civil rights or grant a pardon*, to an entire class of unnamed felons . . .") (emphasis added); *id.* at 343 (distinguishing "the power to remove political disabilities alone" from "all the other clemency powers, such as the pardon power").

This is consistent with the challenged provisions in the Virginia Constitution and Virginia statutes, which give the Governor the power to "restore[ ]" voting rights, VA. CONST. art. II, § 1, VA. CODE ANN. § 24.2-101, or, alternatively, "to

---

doctrine "appear[ed] inapposite to a reenfranchisement case." *Id.* at 1212. When Florida's voters approved an amendment to the state's constitution later in 2018, the appeal became moot before the merits panel could rule. *Hand v. DeSantis*, 946 F.3d 1272, 1274–75 (11th Cir. 2020).

remove political disabilities." VA. CONST. art. V, § 12. None of these provisions reference the Governor's pardon power. Consistent with that, in Virginia, "[a] pardon may be full or partial, absolute or conditional." *Blount v. Clarke*, 291 Va. 198, 205 (2016). Voting rights restoration is just one of the many legal effects of a full or absolute pardon in Virginia, whereas a partial pardon may omit voting rights restoration. *Id*. at 205–06, 210–11. Voting rights restoration is not itself a pardon; nor is it intrinsically or necessarily part of a pardon or even a species of clemency. Forty states plus D.C. handle voting rights restoration entirely outside their clemency systems by creating a non-discretionary path to re-enfranchisement and restoring voting rights upon the completion of incarceration, parole and probation, and/or a waiting period, or not disenfranchising people upon a felony conviction.[10] In any event, it would be formalistic and contrary to Supreme Court

---

[10] There are three categories of non-discretionary restoration schemes: (1) non-discretionary restoration upon release from incarceration (23 states), *see* CAL. ELEC. CODE § 2101(a); COLO. CONST. art. 7, § 10, COLO. REV. STAT. ANN. § 1-2-103(4); CONN. GEN. STAT. ANN. §§ 9-46, 9-46a; HAW. REV. STAT. ANN. § 831-2(a)(1); ILL. CONST. art. III, § 2, 730 ILL. COMP. STAT. 5/5-5-5; IND. CODE ANN. §§ 3-7-13-4, 3-7-13-5; MD. CODE ANN. ELEC. LAW § 3-102(b)(1); MASS. CONST. amend. art. III, MASS. GEN. LAWS ANN. ch. 51, § 1; MICH. COMP. LAWS ANN. § 168.758b; MINN. STAT. ANN. § 609.165; MONT. CONST. art. IV, § 2, MONT. CODE ANN. § 46-18-801(2); NEV. REV. STAT. ANN. § 213.157; N.D. CENT. CODE ANN. §§ 12.1-33-01, 12.1-33-03; N.H. REV. STAT. ANN. §§ 607-A:2, 607-A:3; N.J. STAT. ANN. §§ 2C:51-3, 19:4-1(8); N.M. STAT. ANN. § 31-13-1; N.Y. ELEC. LAW § 5-106(3); OHIO REV. CODE ANN. § 2961.01(A); OR. REV. STAT. ANN. § 137.281(7); 25 PA. STAT. §§ 2602(t), 2602(w); *see also* PA. DEP'T OF STATE, VOTING RIGHTS OF CONVICTED FELONS, CONVICTED MISDEMEANANTS AND PRETRIAL DETAINEES,

precedent to let state-law labels dictate the outcome of these First Amendment claims. Instead, the proper inquiry is whether selective re-enfranchisement in Virginia functions as a licensing scheme and, as discussed above, the answer to that is clear.

*     *     *

Ultimately, the district court's failure to apply a proper functional analysis undermines the purpose behind the First Amendment precedents upon which Appellant has relied. From its inception, the unfettered discretion doctrine has been applied to strike down both obviously and less obviously unconstitutional schemes governing the licensing of protected expression and expressive conduct—*i.e.*, both overt and covert threats of viewpoint discrimination. For instance, in *Saia v. New York*, the Supreme Court invalidated an arbitrary permit scheme for loudspeaker use

---

https://www.pa.gov/content/dam/copapwp-pagov/en/vote/your-rights-and-the-law/Convicted-felon-brochure-English.pdf; R.I. CONST. art. II, § 1; UTAH CODE ANN. § 20A-2-101.5(2); WASH. REV. CODE ANN. § 29A.08.520(1); (2) non-discretionary restoration five years after release from incarceration (1 state), *see* LA. STAT. ANN. § 18:102(A)(1)(b); and (3) non-discretionary restoration following completion of parole and probation (14 states), *see* ALASKA STAT. ANN. § 15.05.030; ARK. CONST. amend. 51, § 11(d); GA. CONST. art. II, § I, para. III; IDAHO CODE ANN. § 18-310(2); KAN. STAT. ANN. §§ 21-6613, 22-3722; MO. ANN. STAT. § 115.133; NEB. REV. STAT. ANN. § 29-112; N.C. GEN. STAT. ANN. §§ 13-1, 13-2; OKLA. STAT. ANN. tit. 26, § 4-101; S.C. CODE ANN. § 7-5-120(B); S.D. CODIFIED LAWS § 24-5-2; TEX. ELEC. CODE ANN. § 11.002; W. VA. CODE ANN. § 3-2-2; WIS. STAT. ANN. § 304.078. Finally, Maine, Vermont, and the District of Columbia do not disenfranchise felons, even while they are incarcerated. ME. CONST. art. II, § 1; VT. STAT. ANN. tit. 28, § 807(a); D.C. MUN. REGS. tit. 3 § 500.2.

53

precisely because viewpoint discrimination is easily concealed by a licensing system with no definite rules or criteria:

> In this case a permit is denied because some persons were said to have found the sound annoying. In the next one a permit may be denied because some people find the ideas annoying. Annoyance at ideas can be cloaked in annoyance at sound.

334 U.S. 558, 562 (1948). As *Saia* and later cases articulated, this preventative doctrine is in large part animated by the risk that viewpoint discrimination will evade detection and judicial review entirely. *See City of Lakewood*, 486 U.S. at 759 (citing "the difficulty of effectively detecting, reviewing, and correcting content-based censorship 'as applied'" as one of two "major First Amendment risks associated with unbridled licensing schemes"); *see also Child Evangelism Fellowship of S.C.*, 470 F.3d at 1064. Given the Supreme Court's stated objective to head off and neutralize difficult-to-detect risks of viewpoint discrimination, the constitutional ban on arbitrary licensing of expressive conduct must be construed functionally and flexibly. In this case, Virginia's selective, arbitrary re-enfranchisement scheme functions as an arbitrary licensing scheme governing the exercise of political expressive conduct. As such, it must be invalidated.

## CONCLUSION

Accordingly, the Court should reverse the district court's decision and remand to the district court with instructions to grant summary judgment in favor of Appellant and to deny Appellees' cross-motion for summary judgment.

## STATEMENT REGARDING ORAL ARGUMENT

Due to the significant legal issues in this case, which present a question of first impression in the U.S. Court of Appeals for the Fourth Circuit, Appellant respectfully requests oral argument pursuant to Local Rule 34(a).


Dated: October 28, 2024                    Respectfully submitted,

                                           /s/ *Jon Sherman*

Victor M. Glasberg                         Jon Sherman
VICTOR M. GLASBERG & ASSOCIATES            Michelle Kanter Cohen
121 S. Columbus Street                     Nina G. Beck
Alexandria, VA 22314                       Emily P. Davis
Tel: 703-684-1100                          FAIR ELECTIONS CENTER
vmg@robinhoodesq.com                       1825 K St. NW, Ste. 701
                                           Washington, DC 20006
                                           Tel: 202-331-0114
                                           jsherman@fairelectionscenter.org
                                           mkantercohen@fairelectionscenter.org
                                           nbeck@fairelectionscenter.org
                                           edavis@fairelectionscenter.org


*Counsel for Appellant*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitations of Fed. R. App. P. 32(a)(7)(B) because it contains 12,801 words, excluding the parts of the brief exempted by Rule 32(f). This brief complies with the typeface requirements of Rule 32(a)(5) and the type style requirements of Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 365 in 14-point Times New Roman.

Dated: October 28, 2024                 Respectfully submitted,

                                         /s/ *Jon Sherman*

Victor M. Glasberg                       Jon Sherman
VICTOR M. GLASBERG & ASSOCIATES          Michelle Kanter Cohen
121 S. Columbus Street                   Nina G. Beck
Alexandria, VA 22314                     Emily P. Davis
Tel: 703-684-1100                        FAIR ELECTIONS CENTER
vmg@robinhoodesq.com                     1825 K St. NW, Ste. 701
                                         Washington, DC 20006
                                         Tel: 202-331-0114
                                         jsherman@fairelectionscenter.org
                                         mkantercohen@fairelectionscenter.org
                                         nbeck@fairelectionscenter.org
                                         edavis@fairelectionscenter.org

                *Counsel for Appellant*

56

## CERTIFICATE OF SERVICE

I certify that on October 28, 2024, I electronically filed the foregoing Opening

Brief of Appellant George Hawkins and Joint Appendix with the Clerk of this Court

by using the appellate CM/ECF system. The participants in the case are registered

CM/ECF users and service will be accomplished by the appellate CM/ECF system.

Dated: October 28, 2024                     Respectfully submitted,

                                            /s/ *Jon Sherman*

Victor M. Glasberg                          Jon Sherman
VICTOR M. GLASBERG & ASSOCIATES             Michelle Kanter Cohen
121 S. Columbus Street                      Nina G. Beck
Alexandria, VA 22314                        Emily P. Davis
Tel: 703-684-1100                           FAIR ELECTIONS CENTER
vmg@robinhoodesq.com                        1825 K St. NW, Ste. 701
                                            Washington, DC 20006
                                            Tel: 202-331-0114
                                            jsherman@fairelectionscenter.org
                                            mkantercohen@fairelectionscenter.org
                                            nbeck@fairelectionscenter.org
                                            edavis@fairelectionscenter.org

                     *Counsel for Appellant*